## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**TERRY WATSON**                                                      **PLAINTIFF**

**VS.**                          **No. 2:20-cv-00170 PSH**

**KILOLO KIJAKAZI,[1] Acting Commissioner,**
   **Social Security Administration**                      **DEFENDANT**

## ORDER

Plaintiff Terry Watson ("Watson"), in his appeal of the final decision of the
Commissioner of the Social Security Administration (defendant "Kijakazi") to deny
his claim for Disability Insurance benefits ("DIB"), contends the Administrative Law
Judge ("ALJ") erred by: (1) failing to resolve an apparent conflict between the
testimony of the vocational expert ("VE") and the *Dictionary of Occupational Titles*
(*DOT*); (2) finding his carpal tunnel syndrome and mental impairments to be non-
severe; and (3) failing to consider his long work record when assessing Watson's
credibility.  The parties have ably summarized the medical records and the testimony

---

[1]

Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021, and
is the proper defendant.  Fed. R. Civ. P. 25(d).

given at the administrative hearing conducted on August 7, 2019. (Tr. 29-61). The Court has carefully reviewed the record to determine whether there is substantial evidence in the administrative record to support Kijakazi's decision. 42 U.S.C. § 405(g). The relevant period under consideration is from Watson's alleged onset date of April 6, 2017, through September 9, 2019, the date of the ALJ's decision.

*The Administrative Hearing:*

Watson was 52 years old, 6'1' tall and weighed 270 pounds at the August 2019 hearing. He stated he lived with his wife and their 16 year old daughter. He was a high school graduate with additional training – a two-year certificate in tool and die work, as well as further training as a machinist.

Responding to questions posed by the ALJ, Watson described his past relevant work as a youth care worker and supervisor at state-run residential facilities, with the work ending on April 6, 2017, when he fell on the job and suffered a severe concussion. Watson testified he was sent to the local hospital in Forrest City before being transported to Little Rock to be treated by a specialist. According to Watson, Drs. Purnell and Johnson opined that he could not return to his job. Watson stated he had not looked for other employment.

When questioned by his attorney, Watson stated he was unable to meet the physical or mental demands of any job. Watson cited pain in his neck and right side

as the primary physical limitation, and estimated he could stand 5-10 minutes before experiencing intolerable pain in his lower lumbar area and neck.  He also estimated he could sit 5-10 minutes before experiencing intolerable pain in the lower lumbar area and left leg.  The pain was relieved by lying down for a two-hour period, according to Watson, which he typically did twice daily.  Watson indicated his pain had been treated with medication, injections, physical therapy, and a TENS unit, which he was wearing at the hearing.  Despite these measures, the pain was "still there." (Tr. 45).  Watson said he took care of household finances and yardwork before the on-the-job injury but could no longer perform those duties.  Watson stated he does "just a little bit of laundry sometimes."  (Tr. 49).

Responding to additional questions from the ALJ, Watson indicated he drives short distances, attends church every Sunday, and visits elderly church members in the hospital.  Citing difficulties in sitting in bleachers, Watson said he would not be attending his daughter's volleyball games.  Watson said he no longer could fish alone, and had fished two months before the hearing, his only outing during the year. Watson accompanied his sons on a Thanksgiving trip to Georgia, with his sons doing the driving.  Watson stated he was always compliant with the physical therapy directives.  Finally, Watson said a surgeon advised against neck surgery.

Mark Cheairs ("Cheairs"), a vocational expert, testified.  The ALJ posed three

hypothetical questions to Cheairs, asking him first to assume a worker of Watson's age, education, and experience during the relevant period who could perform light work with the following restrictions: no climbing of ladders, ropes, or scaffolds; occasionally reach overhead bilaterally; and avoid concentrated exposure to extreme cold and excessive vibration. Cheairs stated such a worker could not perform Watson's past relevant work, but could perform the jobs of cashier and price marker. The following exchange occurred:

> ALJ: "And your testimony thus far consistent with the DOT and where the DOT is silent such as to failing – fails to specifically address occasional overhead reaching, that is based on your training, education, and experience in the field?"
>
> Cheairs: "Yes, Your Honor."
>
> ALJ: "You've dealt with employees and employers where that limitation has been present?"
>
> Cheairs: "Yes, Your Honor."

(Tr. 59). (Tr. 55-59).

*The ALJ's Decision:*

In his September 9, 2019, decision, the ALJ determined Watson had the following severe impairments: headaches, obesity, degenerative disc disease of the

4

cervical spine, cervicalgia, and lumbar radiculopathy.  The ALJ found Watson to have the following non-severe impairments: diabetes mellitus, hypertension, post concussive syndrome, carpal tunnel syndrome, and anxiety and depression.  The ALJ addressed the paragraph "B" criteria, finding Watson had no limitation in understanding, remembering, or applying information, no limitation in interacting with others, no limitation in concentrating, persisting, or maintaining pace, and no limitation in adapting or managing himself.  The ALJ specifically found Watson did not have an impairment or combination of impairments that met or equaled a Listing.  In reaching this conclusion, the ALJ considered Listings 1.04, 11.02B, and 11.02D.  The ALJ also addressed Watson's obesity, finding "no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning."  (Tr. 16).

The ALJ determined Watson had the RFC to perform light work with the restrictions which mirrored those listed in the initial hypothetical question posed to Cheairs.  The ALJ assessed Watson's subjective allegations, finding his statements "not entirely consistent" with the medical record and other evidence in the record.  (Tr. 17).  The ALJ listed some of Watson's activities, including his volunteer work with the elderly, as inconsistent with his subjective allegations.

5

The ALJ then turned to the medical evidence,[2] beginning with Watson's April 2017 emergency room visit following a fall at work.  The ALJ noted the following findings: "no observable neurological abnormalities, intact sensation, full strength throughout, no cervical tenderness to palpation, a good active cervical range of motion without pain or difficulty, a normal gait, and normal speech and language functions." (Tr. 17).  The ALJ acknowledged imaging showed degenerative changes  at C6/C7, partial disc fusion at C5/C6, and nonspecific discitis at C5/C6.  The treating physicians prescribed a conservative course of treatment.

The ALJ reviewed Watson's June, July, August, and September 2017 visits to neurosurgeon Dr. Adametz ("Adametz").   In June, Adametz found a decreased cervical range of motion, numbness in the fourth and fifth digits of the right hand, and weakness in the right arm.  Adametz recorded he was unsure if Watson was giving full effort.  In July, Adametz prescribed continued medication and physical therapy.  In August, Watson reported some improvement with the physical therapy.  Watson was discharged from physical therapy in September, with the therapist reporting to Adametz that Watson continued to have uncontrolled pain.   The therapist recommended a TENS unit.

---

[2]

The Court has reviewed the medical treatment notes and will not separately recite the particulars of treatment during the relevant period.  The ALJ ably summarized the medical record.

6

Adametz sent Watson to Dr. Baskin ("Baskin"), a physical medicine specialist. Baskin's October 2017 examination reflected cervical spine tenderness, dizziness, and painful range of motion.  The ALJ noted, however, that Baskin also found no observable neurological abnormalities, intact sensation throughout, intact and symmetrical reflexes throughout, good strength, intact neuromuscular function, and a normal gait.   The ALJ cited an October 2017 note from physical therapy documenting that Watson was not compliant with his home exercise regimen.  Baskin, finding maximum medical improvement, released Watson from his care in February 2018.

The ALJ addressed the care provided by Dr. Li ("Li"), a neurosurgeon who saw Watson in March of 2018.  Li discouraged surgical intervention, finding very mild psychomotor slowing and diffuse weakness in Watson's right arm.  Li also found a full cervical range of motion, no cervical or lumbar instability, a normal lumbar range of motion, intact sensation throughout, full strength in lower extremities and in upper left extremity, intact and symmetrical reflexes, normal coordination and gait, and an ability to toe walk, heel walk, and squat bilaterally.

The ALJ detailed Watson's treatment for pain management by Dr. Heberlein ("Heberlein") from April to July 2018.  Heberlein observed Watson to have a painful and reduced cervical and lumbar range of motion.  Heberlein administered an epidural

7

steroid injection at C5 through C7 in April 2018, and Watson reported 50% relief for three days. Another epidural injection was given in June 2018, and Watson stated he received 80% relief for twelve days. Finally, Heberlein administered bilateral trigger point injections in July 2018, with Watson reporting 50% relief.

The ALJ noted Li continued to treat Watson for complaints of neck pain, headaches, and poor concentration. Li observed diffuse weakness in Watson's right arm at an October 2018 visit. The ALJ also noted Li found a normal gait, intact cervical and lumbar range of motion, intact sensation and reflexes, full strength in Watson's left upper and lower extremities, and normal coordination. Li's assessment of a November 2018 MRI of the cervical spine revealed degenerative disc disease at C3/C4 and C6/C7 associated with small disc bulges in those areas. Neither area showed significant canal narrowing, though mild bilateral foraminal narrowing was noted at C3/C4 and mild right and moderate-severe left foraminal narrowing was found at C6/C7.

The ALJ cited further treatment by Li in January and February 2019, singling out Watson's normal range of motion in his neck and throughout, and the absence of neurological abnormalities. Finally, the ALJ cited Purnell, Watson's primary care provider, who found no neck abnormalities and no observable musculoskeletal or neurological abnormalities in May 2019.

8

Following his thorough review of the medical treatment records, the ALJ addressed the medical opinions in the record, including those of the state agency medical consultants, Adametz, Baskin, and Dr. Dan Johnson ("Johnson"), who opined Watson to be a good candidate for disability.

The ALJ found Watson unable to perform his past relevant work. However, relying upon the testimony of Cheairs, the ALJ concluded that Watson was capable of performing work in the national economy, such as the jobs of cashier and price marker. Accordingly, the ALJ found Watson was not disabled. (Tr. 11-23).

Watson advances three claims for relief:

**The ALJ failed to resolve an apparent conflict between the testimony of Cheairs and the *DOT*.**

Watson correctly identified the duty of the ALJ, under Social Security Ruling 00-4p, to obtain an explanation from the vocational expert when there is a possible conflict between the expert's testimony and the DOT. *See also Renfrow v. Colvin*, 496 F.3d918 (8th Cir. 2007). Here, a possible conflict was apparent because the ALJ determined Watson could *occasionally* reach overhead bilaterally, while Cheairs identified two jobs, cashier and price marker, which Watson could perform. Both of these jobs require *frequent* reaching. In light of this apparent conflict, the ALJ inquired further of Cheairs:

ALJ: "And your testimony thus far consistent with the DOT and where the DOT is silent such as to failing – fails to specifically address occasional overhead reaching, that is based on your training, education, and experience in the field?"

Cheairs: "Yes, Your Honor."

ALJ: "You've dealt with employees and employers where that limitation has been present?"

Cheairs: "Yes, Your Honor."

(Tr. 59).

In his decision, the ALJ wrote:

> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles, except for the limitation regarding overhead reaching, which the Dictionary of Occupational Titles does not address. However, the vocational expert testified that he based his testimony regarding such limitation on his education and experience in the field.

(Tr. 22).

Watson faults the ALJ's attempt to resolve the conflict, primarily arguing that the conflict may not be resolved by the ALJ's reliance upon the expert's unexplained training, education, and experience. The Court finds that substantial evidence supports the ALJ's resolution of the conflict. The ALJ did not rest his decision on Cheairs' unexplained training, education, and experience. Instead, the ALJ

10

specifically inquired if Cheairs had personal experience with employees and employers dealing with the overhead reaching restriction. Thus, the ALJ recognized the conflict, asked Cheairs about the basis for his testimony on the conflict, followed up with an additional inquiry about Cheairs' personal experiences, and then addressed the apparent conflict in his written decision. The testimony obtained from Cheairs adequately addressed the conflict, and the ALJ met his burden at Step Five of the sequential evaluation. *See Bass v. Saul*, 2021 WL 1813181 (E.D. Ark.) (May 6, 2021) (vocational expert's testimony is sufficient when he/she provides details about qualifications and experience, and knowledge about how jobs are actually performed). This is not an instance where the ALJ failed to address the conflict, nor is it an instance where the expert gave a one-word response and the ALJ failed to inquire further. *See, e.g., Kemp ex rel. Kemp v.* Colvin, 743 F.3d 630 (8th Cir. 2014) (ALJ did not recognize a possible conflict existed and sought no explanation from the expert witness); and *Stanton v. Commissioner, Social Security Administration*, 899 F.3d 555 (8th Cir. 2018) (not sufficient for vocational expert to simply affirm that his/her testimony was consistent with the DOT).

There is no merit to Watson's first claim.

**ALJ error in finding his carpal tunnel syndrome and mental impairments to be non-severe.**

11

At Step 2 of the sequential evaluation, the ALJ determined that some of Watson's impairments, such as diabetes, hypertension, carpal tunnel syndrome, and mental impairments, were non-severe.  Watson alleges error in the ALJ finding his carpal tunnel syndrome and mental impairments were non-severe.  The standard for finding a severe impairment is low.  *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007). Watson bears the burden of showing he has a medically determinable impairment or combination of impairments that significantly limits his ability to perform basic work activities.  *Kirby v. Astrue*, 500 F.3d 705 (8th Cir. 2007); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520 (c), and 404.1521(a).  An impairment is not severe if it is only a "slight abnormality" that does not significantly limit the ability to do basic work activities.  *Kirby v. Astrue,* 500 F.3d at 707.  Additionally, a diagnosis alone does not establish the existence of a severe impairment.  *Perkins v. Astrue*, 648 F.3d 892 (8th Cir. 2011).

The ALJ found Watson's carpal tunnel syndrome was non-severe because "this impairment has not been present for twelve or more months and therefore does not meet the durational requirements necessary for it to be considered a severe impairment."  (Tr. 14).  Watson cites a November 2018 nerve conduction study reflecting mild-to-moderate carpal tunnel syndrome.  The relevant period closed with the ALJ's September 9, 2019 decision.  The ALJ's calculation is correct – Watson

does not meet the twelve month durational requirement to establish a severe impairment, even assuming there was proof that the impairment significantly limited his ability to perform basic work activities.  42 U.S.C. § 423(d)(1)(A).

Addressing the mental impairments, the ALJ considered the four areas of mental functioning known as the "paragraph B" criteria, finding no limitation in any of the four areas.  The ALJ addressed the medical records, noting Watson received no treatment from mental health professionals during the relevant period.  The ALJ also addressed Johnson's April 2019 opinion that Watson appeared to be a good candidate for disability.  Substantial evidence supports the ALJ's conclusions regarding the non-severe impairments he identified.

Further, any error in failing to designate carpal tunnel syndrome or mental impairments as severe impairments is harmless.  The ALJ did not conclude his analysis at Step 2 in this instance.  Instead, he found other severe impairments and proceeded with the sequential evaluation.  Once an ALJ finds that a claimant has a "severe" impairment at Step 2, the ALJ must then consider all impairments, including those that are not severe, in determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1545(e); 416.945(e); Social Security Ruling 96–8p, at 5; *see also Maziarz v. Secretary of Health and Human Serv.,* 837 F.2d 240, 244 (6th Cir.1987) (failure of ALJ to find claimant's cervical condition was severe at Step 2 was not reversible error

where ALJ found the claimant had severe heart disease and proceeded with the sequential evaluation).  Here, the ALJ wrote that he had "considered all symptoms" in reaching his RFC determination.  (Tr. 16).  There is no merit to this argument.

**ALJ error in failing to consider his long work record when assessing Watson's credibility.**

Watson maintains the evaluation of his subjective complaints was inadequate because the ALJ failed to mention his lengthy work history.

As part of assessing the claimant's RFC, the ALJ is required to evaluate the subjective statements of the claimant.  *See Pearsall v. Massanari*, 274 F.3d 1211 (8th Cir. 2001).  The ALJ does so by determining whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluating the intensity, persistence, and limiting effects of the pain or other symptoms.  *See* Social Security Ruling ("SSR") 16-3p.  In making the latter evaluation, the ALJ must consider all the evidence, including information about the claimant's prior work record, and evidence of the following factors:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other

14

than treatment a claimant uses or has used to relieve pain or other symptoms . . . ; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See SSR 16-3p.

In determining the consistency of Watson's allegations, the ALJ recited the two-step process whereby he must first determine if there is an underlying physical or mental impairment which could reasonably be expected to produce his symptoms. Then, the ALJ noted he must evaluate the intensity, persistence, and limiting effects of Watson's symptoms to determine the extent to which they functionally limit him. The ALJ noted that if the objective medical evidence did not substantiate Watson's assertions of pain or other symptoms, the ALJ is then obligated to consider other evidence in the record. In this instance, the ALJ recited the subjective complaints of Watson and deemed those statements "inconsistent." (Tr. 17). The ALJ listed Watson's daily activities, including his volunteer work with the elderly and his ability to drive and tend to his personal needs, as factors in his decision. The ALJ then turned to the objective medical evidence, which he examined in detail. The ALJ's evaluation of Watson's subjective complaints was not exhaustive and failed to explicitly mention his work history. The evaluation was nevertheless adequate and is supported by substantial evidence. The Court so finds for the following reasons.

First, the ALJ could and did find that Watson has medically determinable

15

impairments that could reasonably be expected to produce pain or other symptoms. Specifically, the ALJ could and did find that Watson's headaches, obesity, degenerative disc disease of the cervical spine, cervicalgia, and lumbar radiculopathy could reasonably be expected to produce pain and other symptoms. The ALJ stressed, however, that the *severity* of the subjective allegations was not borne out by the record.

Second, the ALJ thoroughly evaluated the objective medical evidence, emphasizing the numerous findings by the providers of no observable neurological abnormalities, full strength, normal range of motion, normal gait, and normal coordination. In addition, the conservative nature of the treatment was cited.

The ALJ could have devoted more attention to the non-medical evidence. A more complete analysis of the non-medical evidence would have been helpful. The lack of such an evaluation, however, does not warrant a remand, and the ALJ is not required to explicitly discuss each relevant factor. *See Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005). Also, the ALJ was aware of Watson's work history, mentioning it at the hearing and elsewhere in his decision. (Tr. 37-43, 21). Although it would have been preferable for the ALJ to provide a more detailed analysis of the relevant factors, in this instance, the ample objective medical evidence and the ALJ's statement that he considered the non-medical factors suffice to support his conclusion.

16

In summary, substantial evidence supports the determinations reached by the ALJ.  The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion.  The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Kijakazi is affirmed and Watson's complaint is dismissed with prejudice.

IT IS SO ORDERED this 16th day of August, 2021.

_____
UNITED STATES MAGISTRATE JUDGE